## In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-1489 & 11-1493

ECHO, INCORPORATED,

*Plaintiff/Counter-Defendant-Appellee,*

*v.*

TIMBERLAND MACHINES & IRRIGATION, INC.,

*Defendant/Third-Party Plaintiff-Appellant,*

*v.*

LAWN EQUIPMENT PARTS COMPANY,

*Third-Party Defendant-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 08 C 7123 & 09 C 2673—**Charles P. Kocoras**, *Judge.*

ARGUED SEPTEMBER 7, 2011—DECIDED OCTOBER 25, 2011

Before POSNER, FLAUM and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge.* This case involves two con-
solidated appeals, which arise out of the termination of

the business relationship between appellant Timberland Machines & Irrigation, Inc. ("TMI"), a distributor, and appellee Echo, Inc. ("Echo"), a supplier. After terminating its distributor agreement with TMI, Echo turned TMI's former sales territory over to another distributor, appellee Lawn Equipment Parts Company ("LEPCO"). TMI claims Echo improperly terminated the distributor agreement, and that LEPCO improperly induced Echo to do so. Echo, in turn, seeks to recover from TMI on unpaid invoices. The district court granted summary judgment in favor of Echo and LEPCO (and against TMI) on all claims. We affirm the judgment of the district court.

## I.  Background

### A.  Factual Background

Echo is a supplier of commercial and retail outdoor power equipment, including power trimmers, chainsaws, and blowers. TMI is a distributer of such outdoor power equipment, as well as of irrigation equipment. TMI operated two divisions for purposes of distributing those products—the Timberland Machines division and the Sprinkler House division. Beginning in August 2004, TMI distributed products supplied by Echo pursuant to a Distributor Agreement. TMI's sales territory for Echo products covered several states in New England.

On October 21, 2008, Echo provided TMI with written notice that it was terminating the Distributor Agreement effective in sixty days. Echo then shifted sales responsibilities for the New England region to another distributor,

LEPCO, which already handled sales for Echo in the Mid-Atlantic region. According to Echo, it made the decision to terminate TMI as a distributor in August 2008 in light of TMI's financial condition. In particular, TMI was in a significant amount of debt, its lenders had refused to loan it any more money, and one lender had threatened to recall all loans to TMI. TMI responds that Echo vastly overstates the financial difficulties it faced prior to the termination of the Distributor Agreement.

Having decided to end its relationship with TMI, Echo contacted LEPCO to determine whether it could assume responsibility for the New England region. LEPCO prepared a PowerPoint presentation dated September 30, 2008 demonstrating its ability to take over the additional territory, and met with Echo to discuss the possible transition. On December 22, 2008, New England was added by Echo to LEPCO's distribution territory.

During the time TMI acted as a distributor for Echo, it also distributed products for other suppliers and manufacturers, including Exmark, Billy Goat, MTD/White Outdoor, Columbia, Snow Ex, Kipor Generators, Yamaha Generators, Brown, and Oregon Forestry. According to TMI, however, none of the products it sold from other suppliers competed with its Echo products. The district court concluded that, between 2004 and 2008, TMI sold more Exmark products (in terms of total sales and gross profits) than it did products from any other supplier, including Echo, whose products accounted for between 30 and 35% of TMI's total sales and gross profits. However, TMI contends that a proper calculation of its sales of

Echo products must include both (1) its sales of Bear Cat products (a company Echo acquired in 2006) and (2) sales of Echo products to Home Depot because, despite the fact that Home Depot purchased directly from Echo, TMI facilitated those sales and made a commission on the sales of Echo products made by Home Depot stores in its sales territory. TMI also maintains that sales made by its Sprinkler House division should be disregarded, as that division was not profitable. When the Bear Cat and Home Depot sales are accounted for, and the Sprinkler House is ignored, sales of Echo products account for over 50% of TMI's total sales and gross profits.

TMI closed its Sprinkler House division, which had been unprofitable since 2006, in 2008. In February 2009, TMI went out of business entirely.

### B.   Procedural Background

On December 11, 2008, Echo filed suit against TMI in the Northern District of Illinois, asserting a breach of contract claim, a goods sold and delivered claim, and an account stated claim. Echo alleged that TMI had failed to pay for products purchased from Echo; it sought damages in the amount of the unpaid sum owed to Echo by TMI plus interest. On December 23, 2008, TMI filed a separate suit, also in the Northern District of Illinois, against Echo and LEPCO. In its complaint, TMI asserted various claims against Echo, including one for violation of the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133f (2011). It set forth claims against LEPCO for tortious interference with a contract, unjust enrichment, and for

violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b (2011). Shortly thereafter, on December 31, 2008, TMI filed an answer in the original case, and asserted counterclaims against Echo. The counterclaims were identical to the claims against Echo in the TMI-initiated suit. The two cases were consolidated in the district court.

On October 1, 2010, Echo filed a motion for partial summary judgment, seeking judgment in its favor on its account stated claim and on TMI's Connecticut Franchise Act claim.[1] That same day, LEPCO sought summary judgment on all of TMI's claims against it. In its response to Echo's motion for summary judgment, TMI relied on an affidavit from its President and Secretary, Mark Zeytoonjian. Echo filed a motion to strike significant portions of that affidavit on the ground that it offered undisclosed expert testimony.

In an opinion dated January 18, 2011, the district court granted Echo's motion to strike paragraphs 16 through 108 of Mark Zeytoonjian's affidavit. *Echo, Inc. v. Timberland Machs. & Irrigation, Inc.*, Nos. 08 C 7123, 09 C 2673, 2011 WL 148396, at *3 (N.D. Ill. Jan. 18, 2011). In addition, the court granted Echo's motion for partial summary judgment and granted LEPCO's motion for summary judgment. On Echo's account stated claim, the court concluded that TMI owed Echo $1,607,092.77 in principal on unpaid invoices, and $215,152.30 in inter-

---

[1] The district court previously had dismissed TMI's other counterclaims against Echo.

est. *Id*. at 6. Following the summary judgment rulings, Echo and LEPCO filed a joint motion for entry of final judgment, in which Echo sought a judgment on the pleadings as to its remaining two claims. In response, TMI stated that the motion should be denied for the reasons stated in its briefs opposing Echo and LEPCO's motions for summary judgment. The district court granted the motion and entered judgment on the pleadings on Echo's claims for breach of contract and for goods sold and delivered. The damages award remained unchanged. TMI appeals.

## II.  Discussion

We review the district court's grant of summary judgment de novo, construing all facts and inferences in the light most favorable to TMI, the non-movant, in determining whether a genuine issue of material fact exists that would preclude summary judgment. *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, 547 F.3d 882, 886 (7th Cir. 2008).

### A.  Mark Zeytoonjian's Affidavit and TMI's Connecticut Franchise Act Claim Against Echo

The district court characterized portions of Mark Zeytoonjian's affidavit as expert testimony under Federal Rule of Evidence 702, and struck those portions as inadmissible because TMI had not disclosed Zeytoonjian as an expert witness. TMI argues that Zeytoonjian's testimony should have been characterized as lay opinion testimony under Rule 701, not as expert

testimony under Rule 702. As such, the court erred in striking portions of the affidavit. We review the district court's classification of a witness as lay or expert de novo. *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 559 (7th Cir. 2008).

Rule 701 requires that lay testimony be "limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The final requirement is designed "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701, Advisory Comm. Notes, 2000 Amendment.

The stricken portions of Zeytoonjian's affidavit are integral to TMI's Connecticut Franchise Act claim against Echo. Therefore, a slight detour to discuss the Connecticut statute is appropriate. The Connecticut Franchise Act prohibits franchisors from "terminat[ing], cancel[ing] or fail[ing] to renew a franchise, except for good cause." Conn. Gen. Stat. § 42-133f(a). The Act defines a "franchise" as an oral or written agreement or arrangement in which:

> (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed

in substantial part by a franchisor, . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate. . . .

Conn. Gen. Stat. § 42-133e(b). The district court did not address the first requirement. Rather, it granted summary judgment in favor of Echo on the ground that TMI had failed to set forth sufficient evidence to create a triable issue of fact regarding the second statutory requirement for establishing a franchise—that TMI is substantially associated with Echo's trademark, trade name or other commercial name or symbol.

Courts have construed the Act's "substantially associated" provision as requiring a plaintiff to show that "most, if not all, of its business derives from association with the defendant" in order to establish the existence of a franchise. *Rudel Mach. Co., Inc. v. Giddings & Lewis, Inc.*, 68 F.Supp.2d 118, 124-28 (D. Conn. 1999). *See also Contractors Home Appliance, Inc. v. Clarke Distrib. Corp.*, 196 F.Supp.2d 174, 180 (D. Conn. 2002) ("while the Connecticut Franchise Act does not require that a putative franchisee carry exclusively franchisor-trademarked products, a showing that the putative franchisor's products account 'for most or all of [the franchisee's] business' is required") (citation omitted). The "most or all" language has its origins in a Second Circuit decision interpreting the Act, *Grand Light and Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672 (2d Cir. 1985). In *Grand Light*, the Second Circuit explained:

> The purpose of the statute was to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee. . . . In the ordinary franchise situation, typically involving an exclusive relationship, termination by the franchisor could result in economic disaster for the franchisee. Where the franchisee is completely dependent on the public's confidence in the franchised product for *most or all of his business*, abrupt severance of the franchise tie, without good cause and without sufficient notice, could spell ruination.

*Id.* at 677 (emphasis added). Based on the "most or all" formulation, courts have found that a franchise existed only where at least half of the plaintiff's business resulted from its relationship with the defendant. *See B & E Juices, Inc. v. Energy Brands, Inc.*, No. 3:07 C 1321, 2007 WL 3124903, at *16 (D. Conn. Oct. 25, 2007) (no substantial association where sales constituted 40% of the distributor's business); *Rudel,* 68 F.Supp.2d at 124-28 (concluding that plaintiff failed to establish franchise where sales of defendant's products constituted approximately 41% of plaintiff's business and the gross profit attributable to sales of defendant's products was approximately 40%); *Dittman & Greer, Inc. v. Chromalox, Inc.*, No. 3:09 C 1147, 2009 WL 3254481, at *6 (D. Conn. Oct. 6, 2009) (evidence that defendant's products accounted for 42% percent of plaintiff's total sales and 33-34% of plaintiff's gross profits not sufficient to establish a franchise relationship); *Hartford Elec. Supp. Co. v. Allen-Bradley Co., Inc.*, 736 A.2d 824, 837 (Conn. 1999) (finding franchise relationship where half of plaintiff's gross annual sales

were attributable to relationship with defendant). Unlike the federal courts cited above, however, Connecticut state courts have not weighed in on whether 50% is a strict cut off.

Turning back to the affidavit, the stricken portions are aimed at establishing that more than 50% of TMI's sales and gross profits resulted from its business with Echo. In its summary judgment motion, Echo relied on sales and gross profit figures demonstrating that less than 50% of TMI's business was with Echo; Zeytoonjian sought to discredit those figures. First, Zeytoonjian stated that because TMI's Sprinkler House division had not been profitable, its sales and gross profits figures should not be considered in determining TMI's sales and gross profits. He provided no further explanation for that conclusion. Second, Zeytoonjian stated that a portion of TMI's freight costs and a portion of dealer rebates must be deducted from the gross profits attributable to Echo. Third, Zeytoonjian opined that sales attributable to Bear Cat, a company acquired by Echo in 2006, should be included in the total sales figure of Echo products. Finally, he maintained that the commissions TMI received from Echo for sales of Echo products by Home Depot should be included in TMI's gross profits figure for Echo products, and that the Home Depot sales related to those commissions should be included in TMI's gross sales figure of Echo products.

The district court excluded those opinions on the ground that a layperson without knowledge of accounting principles could not arrive at the conclusions Zeytoonjian

drew in his affidavit. For example, with respect to Zeytoonjian's assertions regarding Home Depot, the district court reasoned that only an accounting expert could say whether commissions for facilitating a third party's purchase of a supplier's products directly from the supplier should be included in the distributor's total sales figure for that supplier.

TMI disputes these exclusions and contends that Zeytoonjian simply testified as to factual statements of which he had personal knowledge as TMI's president. As the advisory committee notes to Rule 701 explain, a business owner or officer is allowed to testify "to the value or projected profits of the business, without [being qualified] as an accountant, appraiser, or similar expert" where that testimony is based on the "particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701 Advisory Comm. Notes, 2000 Amendment; *see also Titan Int'l*, 533 F.3d at 560; *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009) ("In the realm of lost profits, lay opinion testimony is allowed in limited circumstances where the witness bases his opinion on particularized knowledge he possesses due to his position within the company."). Zeytoonjian's affidavit attacks both Echo's gross profit analysis and gross sales analysis.

We will begin with Zeytoonjian's discussion of the Sprinkler House division. The district court correctly excluded Zeytoonjian's opinion regarding the inclusion of the Sprinkler House's profits. Regardless of whether that opinion constitutes expert testimony, it must be

stricken because it "rest[s] on [nothing more than Zeytoonjian's] say-so rather than a statistical analysis," or any other analysis for that matter. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-20 (7th Cir. 2005) (both expert and lay testimony is inadmissible where it consists of unsupported inferences from raw data). Because Zeytoonjian's opinion that the Sprinkler House division should be disregarded is supported by nothing but his *ipse dixit*, it was properly excluded.

Including the Sprinkler House division's sales and gross profits figures in TMI's overall calculations proves fatal to TMI's gross profit analysis. When these figures are added, even accepting the reminder of Zeytoonjian's opinions (e.g., including Bear Cat revenues and Home Depot commissions in the profit attributable to Echo), business with Echo results in less than 50% of TMI's total gross profits in every relevant year. The figures range from 34.41% to 41.37%.

Turning now to the gross sales analysis, if Zeytoonjian's opinion regarding the inclusion of the Home Depot sales numbers in TMI's sales of Echo products is accepted, Echo products account for over 50% of TMI's total sales. The district court concluded that only an accounting expert could say whether the Home Depot sales should be included in TMI's total sales figure for Echo. However, given Zeytoonjian's role as TMI President and Secretary, he could likely assess the appropriateness of including those sales.

Even so, in light of the Act's purpose, it makes little sense to include the Home Depot sales figures in TMI's

sales of Echo products, as TMI did not benefit from the full sales price on those products.[2] Instead, TMI received a smaller commission on those sales. Therefore, the inclusion of the full sales numbers overstates the impact of a termination on TMI's bottom line. It makes more sense to include only the commission figure in determining the amount of Echo sales by TMI, as that is the amount of money TMI will lose as a result of the termination. If only the commissions, and not the full sales numbers, are included in TMI's sales of Echo products, Echo products account for less than 50% of TMI's total sales. In the relevant years, the figures range from 29.95% to 34.97%.

Apart from the discussion of profits and sales, TMI argues that the fact that it went out of business alone establishes the existence of the requisite substantial association. In *Hartford*, the Connecticut Supreme Court suggested that "the likely result of a disassociation of the parties" may be an appropriate consideration in determining "how dependent, or associated, the franchisee is on its franchisor and its commercial symbols." 736 A.2d at 839. The court noted that some federal courts had looked at such considerations, and noted that "[i]n the present case, termination of the parties' agreement would

---

[2] The Act is designed to prevent franchisees from going out of business as a result of termination by the more powerful franchisor. The inquiry into the impact of such a termination on the purported franchisee's sales numbers is meant to determine how economically dependent the purported franchisee is on its relationship with the purported franchisor.

result in the plaintiff losing one half of its gross annual sales of $20 million," and that "the trial court [had] found that such an action would cause the plaintiff's entire business to fail." *Id.*

No court, however, has relied solely on the fact that a company went out of business to conclude that a franchise relationship existed. More importantly, TMI's current claim that the Echo termination caused it to go out of business is inconsistent with its position below that "[t]he loss of Echo was not the death knell to [TMI] because it could have survived absent a dire economy." Similarly, TMI also stated it "failed only because Fred Zeytoonjian [TMI's CEO] failed to invest $1.4 million only because of a dire economy." Accordingly, we affirm the district court's grant of summary judgment in Echo's favor on TMI's Connecticut Franchise Act claim. As demonstrated above, TMI failed to show that more than 50% of its business resulted from its relationship with Echo, and thus failed to establish the requisite franchise relationship.

## B.  Award of Interest on Echo's Claims Against TMI

The district court awarded Echo $215,152.30 in interest on its successful account stated claim. That award was based on a rate of prime plus 4%, the rate Echo had charged TMI on overdue balances in the past. Noting that TMI did not dispute that late fees were owed, the district court concluded that TMI had waived any objection to the interest charges by not adequately developing its argument on that point.

In its brief opposing Echo's motion for summary judgment, TMI devoted the following three sentences to the argument opposing an interest award:

A party in breach of a contract cannot seek the protection of its provisions. In the present case, Echo cannot seek in its Account Stated claim recovery of interest or late fees because it breached the franchise agreement. The alleged contract sum also does not offset Timberland's damages. (citations omitted).

TMI makes the identical argument in its opening brief on appeal, which does not address the district court's waiver determination. We agree with the district court that the argument is too skeletal, and amounted to a waiver. *See Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 855 (7th Cir. 1998) (argument raised in three sentences is waived). TMI neither explains how Echo breached the franchise agreement (it has clarified in this Court, though only in its reply brief, that Echo allegedly breached the franchise agreement by terminating it without cause), nor what provisions of that agreement Echo has invoked in seeking prejudgment interest.

Even if TMI had properly preserved that argument, it fails on the merits. The account stated claim was not based on the franchise agreement. *Brad Foote Gear Works, Inc. v. Delta Brands, Inc.*, 349 F.Supp.2d 1073, 1075 (N.D. Ill. 2004) (material disputed fact concerning contract claim "in no way precluded granting summary judgment on the account-stated claim"). Nor was Echo's claim for interest based exclusively on the franchise agreement. Rather, that claim appears to have been based on

language in Echo's invoices, which TMI had paid in the past.

TMI accepted the goods at issue, and thus is contractually obligated to pay the interest stated on the invoice under the Uniform Commercial Code, codified at 810 Ill. Comp. Stat. 5/2-207 (West 2011); *See K-Koncrete, Inc. v. Mack Trucks, Inc.*, No. 85 C 9538, 1987 WL 9337, at *7 (N.D. Ill. Apr. 3, 1987) ("Illinois law . . . impose[s] a contractual duty to pay interest on a party who (1) accepts goods accompanied by an invoice stating an interest obligation and (2) offers no objection to the stated terms") (referencing U.C.C. § 2-207(2)(c)); *Inspec Foams, Inc. v. Claremont Sales Corp.*, No. 01 C 8539, 2002 WL 1765630, at *3 (N.D. Ill. July 30, 2002) (under section 5/2-207, "overdue payment interest penalty clauses in a seller's shipping documentation are not considered material alterations of the parties' contract and thus are incorporated into the parties' contract terms"); *Extel Corp. v. Cermetek Microelectronics, Inc.*, 539 N.E.2d 320, 323 (Ill. App. Ct. 1989) (buyer required to pay interest pursuant to the terms set forth in seller's invoices where "there was no showing that acceptance was limited to the terms of the offer or that plaintiff objected to the interest provision within a reasonable time"). We affirm the interest award.

## C.   TMI's Claims Against LEPCO

### 1.   Tortious Interference with Contract

In this diversity suit, we apply Illinois law to TMI's common law claims. *See Business Sys. Eng'g*, 547 F.3d at

886.[3] To establish a tortious interference with a contract claim under Illinois law, a plaintiff has the burden of proving the following elements: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of a breach; (4) defendant's wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages. *Purmal v. Robert N. Wadington & Associates*, 820 N.E.2d 86, 98 (Ill. App. Ct. 2004); *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905 (7th Cir. 1990). The district court entered summary judgment in LEPCO's favor on TMI's tortious interference claim on the ground that TMI failed to present sufficient evidence to establish the third and fourth elements. We affirm.

On appeal, TMI maintains that LEPCO wrongfully interfered with its Distributor Agreement by making a pitch to Echo on September 30, 2008, in which it proposed taking over TMI's territory for Echo. LEPCO presented evidence in support of its summary judgment motion—including the testimony of Echo president Daniel Obringer, Echo VP of Sales Michael Best, and LEPCO president Jeffrey Clark—that LEPCO made the September 30 presentation at Echo's request, and that Echo only

---

[3] Note that the district court cited both Illinois and Connecticut law. TMI has shown no material difference between Illinois and Connecticut law. Without such a showing, we apply Illinois law to TMI's common law claims.

contacted LEPCO after making the decision to terminate TMI in late August 2008. TMI attempts to create a genuine issue of fact as to when the termination decision was made by noting that the presentation included a slide showing that LEPCO outperformed TMI. TMI argues that LEPCO would not have included such information had Echo already agreed to terminate its relationship with TMI. Even construing in TMI's favor, such evidence does not create a genuine issue of fact. The purpose of the presentation was to convince Echo that LEPCO could take over the territory; while Echo had decided to terminate TMI, it had not yet awarded the business to LEPCO.

TMI also tries to create a fact issue by suggesting that LEPCO built a new 225,000 square foot warehouse, which TMI notes was much larger than LEPCO needed at the time, in an effort to win TMI's Echo territory. It is undisputed that LEPCO purchased the land for that warehouse in June 2004, and opened it in January 2007. TMI's argument simply makes no sense, as TMI did not even become an Echo distributor until August 2004.

Because TMI failed to create a genuine issue of fact as to unjustified inducement by LEPCO or causation, we affirm the district court's grant of summary judgment in LEPCO's favor on TMI's tortious interference claim.

### 2. Connecticut Unfair Trade Practices Act

The basis of TMI's Connecticut Unfair Trade Practices Act ("CUTPA") claim against LEPCO is its tortious inter-

ference claim. Because we affirm the grant of summary judgment as to the tortious interference claim, we likewise affirm the grant of summary judgment in LEPCO's favor on TMI's CUTPA claim.

### 3.  Unjust Enrichment

TMI asserts two bases for its unjust enrichment claim against LEPCO. It first relies on its tortious interference claim. For the reasons stated above, that basis does not support an unjust enrichment claim. TMI also contends that LEPCO was unjustly enriched when Echo "mistakenly" gave LEPCO the business that previously belonged to TMI in violation of the Distribution Agreement. That second contention turns on the outcome of TMI's Connecticut Franchise Act claim against Echo. As noted above, we affirm the grant of summary judgment to Echo on TMI's Connecticut Franchise Act claim. Consequently, the second basis for TMI's unjust enrichment claim fails. We affirm the grant of summary judgment in LEPCO's favor on TMI's unjust enrichment claim.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Echo and LEPCO.