In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-3100

HARRY FOSTER, III and LINDA FOSTER,

*Plaintiffs-Appellants*,

*v.*

STATE FARM FIRE AND CASUALTY COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:10-cv-00020-TLS-RBC—**Theresa L. Springmann**, *Judge.*

ARGUED FEBRUARY 23, 2012—DECIDED MARCH 16, 2012

Before FLAUM and TINDER, *Circuit Judges,* and
SHADID, *District Judge.*[*]

TINDER, *Circuit Judge.* This case presents two issues,
both under Indiana law: First, whether the Fosters

---

[*] The Honorable James E. Shadid, District Judge for the
United States District Court for the Central District of Illinois,
sitting by designation.

breached their insurance contract with State Farm by failing to comply with a section titled "Your Duties After Loss" and, second, whether State Farm's delay in deciding the Fosters' claim was in bad faith and therefore tortious. The district court granted State Farm's motion for summary judgment. We affirm.

On January 3, 2009, while Harry and Linda Foster, their two children, Harry's father, and the family's eight dogs were out, a fire severely damaged the Fosters' home. Mrs. Foster submitted a claim to State Farm under the family's homeowners' policy the next day. State Farm promptly began requesting documents, authorizations, and interviews. Based on its initial interviews, State Farm learned that the Fosters had at least two businesses, held numerous personal and business accounts, and were involved in multiple lawsuits.

At the end of January, State Farm sent a letter to the Fosters restating its initial requests for information and documents, including blueprints, utility bills, and receipts for electrical components in the "theater room." State Farm wrote the Fosters again in early March to remind them of their contractual obligations, quoting the following policy provisions:

> **2. Your Duties After Loss**. After a loss to which this insurance may apply, you shall see that the following duties are performed:
>
> * * *
>
> > **c.** Prepare an inventory of damaged or stolen personal property. Show in detail

the quantity, description, age, replacement cost and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;

**d.** as often as we reasonably require:

> **(1)** exhibit the damaged property;
>
> **(2)** provide us with records and documents we request and permit us to make copies;
>
> **(3)** submit to and subscribe, while not in the presence of any other insured:
>
>> **(a)** statements; and
>>
>> **(b)** examinations under oath; and
>
> **(4)** produce employees, members of the insured's household or others for examination under oath to the extent it is within the insured's power to do so; and

**e.** submit to us, within 60 days after the loss, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief: [details about the cause of the loss and damaged or destroyed property]

\* \* \*

**6. Suit Against Us**. No action shall be brought unless there has been compliance with the policy provisions. The action must be started within one year after the date of loss or damage.

By mid-March, State Farm's fire investigator had concluded that the fire was intentionally set and the Fosters' claim was referred to the insurance company's Special Investigative Unit. State Farm informed the Fosters that "there is a question as to whether the loss is accidental as it relates to a named insured" and requested additional documents, such as detailed phone records, bank account transaction histories, tax returns, and mortgage information. State Farm also reminded the Fosters that their proof of loss was due by May 2, 2009. (By the way, all significant communications between the Fosters and State Farm that we discuss in the opinion took place between their lawyers because both the insureds and the insurer retained counsel from nearly the beginning of the claim process.)

In April, the Fosters requested a 60-day extension for filing their proof of loss. State Farm granted the extension, reminded the Fosters of its previous document requests, and encouraged the Fosters to produce documents as they got them so the claim process could move forward. A few days after the initial 60-day extension, the Fosters informed State Farm that they were hiring a new attorney and requested additional time to file their proof of loss. State Farm granted the Fosters' request and gave them until August 5, 2009 to file. In the same letter that granted that second extension, State

Farm restated its previous request for documents, added the Fosters' 2008 taxes to its request list, and emphasized that the documents already in the Fosters' possession should be produced "as quickly as possible" to facilitate the claim process and because there could be follow-up questions and requests.

On May 20, the Fosters sent State Farm phone bills and a signed medical release and indicated that they were trying to get other requested documents, which they said they would produce shortly. At the beginning of July, the Fosters told State Farm that they were "close to obtaining the information and documents you've requested in your previous letters." The Fosters produced some additional documents in July but many remained outstanding. On August 5, the Fosters delivered close to 1,000 pages of documents, including their proof of loss.

On August 13 and 25, Mr. Foster sat for his "examination under oath" (EUO). On August 26, Mrs. Foster began her EUO. Based on statements by the Fosters during those EUOs about previously undisclosed bank accounts and business dealings, State Farm requested financial information dating back to 2002. On September 3, State Farm sent the Fosters lists of old and new document and information requests. Mrs. Foster's EUO was continued on September 9. During that continuation of her EUO, Mrs. Foster said that she was still gathering requested documents. The next day, during her third day of questioning, Mrs. Foster told State Farm that the Fosters had actually earned more money than reported in their 2004-2007 tax returns. That day's interview ended with the following exchange:

| Counsel for State Farm: | Okay. I suppose this is probably a good place to stop, and we'll adjourn. And by agreement, Counsel, is that correct? |
| Counsel for Mrs. Foster: | Correct. |
| Counsel for State Farm: | And we're going to reconvene at a later date when we gather these documents that we've been talking about for several days. |
| Counsel for Mrs. Foster: | Correct. |

On September 21, State Farm sent the Fosters a master-list of old and new requests. All together, State Farm was asking for fifty-nine categories of information and documents.

The Fosters sent State Farm a status report on October 1. For a majority of the requests, the Fosters said that they were either looking into them or that they had themselves already sent requests to various financial institutions for responsive documents. On December 2, State Farm sent the Fosters its own detailed status report. According to its records, State Farm had not received a majority of the requested documents or an explanation for why they could not be produced. State Farm expressed concern "about the lack of documents the Fosters have provided since the last session of

Mrs. Foster's examination under oath on September 10, 2009" and concluded the letter by referring to Mrs. Foster's incomplete EUO: "Pursuant to our agreement, we agreed to cancel and reschedule Mrs. Foster's examination under oath to allow [the Fosters] additional time to produce these documents. Upon substantial compliance with the requests listed above, we will reschedule the continuation of Mrs. Foster's examination under oath."

On December 11, the Fosters responded: "We are disturbed by State Farm's unsupported allegations that the Fosters have produced a 'lack of documents.' Specifically, we are concerned with the growing evidence of State Farm's bad faith in assessing the Foster's claim. . . . By this letter, if you are attempting to create a noncooperation or noncompliance issue in [the Fosters'] policy, it is strictly foreclosed and we are firmly establishing a reasonableness boundary in responding to your copious and often unreasonable requests." The Fosters also stated that they believed they had until January 3, 2010 to sue on the contract. The Fosters then updated their position on each of State Farm's requests. For a majority, they declared that they "possess nothing further to produce." The Fosters ended the letter by reminding State Farm that they were not going to "ignore" their $2.6 million claim and gave State Farm "until December 23, 2009 to complete your examinations under oath, your evaluation of this claim, and make a decision."

State Farm answered on December 15: "Your letter strikes a curious tone, given your prior acknowledgement of the amount of documents that were still out-

standing at the time we mutually agreed to continue Mrs. Foster's examination under oath. . . . [W]hile [the Fosters] have provided numerous documents, there is still a significant amount of relevant information that [the Fosters] have identified in their examinations under oath, agreed to provide, and have chosen not to provide, to date." State Farm again quoted the Your Duties After Loss section of the policy, rejected the Fosters' deadline of December 23, and explained that "your statement that suit must be initiated by January 3, 2010 is not accurate since the implementation of Ind. Code § 27-1-13-17 on June 27, 2007 establishing the minimum period of a policyholder to bring an action against an insurer to no less than two years from the date of loss." State Farm's letter did not deter the Fosters. They filed this suit for breach of contract and bad faith on December 30, 2009, just shy of the one-year anniversary of the fire.

Approximately two years after removal from state court, the district court granted State Farm's motion for summary judgment. *Foster v. State Farm Fire & Cas. Co.*, No. 1:10-cv-20, 2011 WL 3610425 (N.D. Ill. Aug. 17, 2011). As usual, we review the district court's grant of summary judgment de novo, viewing the facts in a light most favorable to the non-moving party. *Echo, Inc. v. Timberland Mach*s*. & Irr., Inc.*, 661 F.3d 959, 963 (7th Cir. 2011). A motion for summary judgment should be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528

F.3d 508, 512 (7th Cir. 2008). The parties (properly) agree that this diversity case is governed by Indiana law. *Id.*

For the contract claim, the relevant Indiana law is set out in *Morris v. Economy Fire & Cas. Co.*, 848 N.E.2d 663 (Ind. 2006). *Morris* involved a suit by an insured claiming breach of contract and bad faith because the insurer refused to provide a transcript of recorded statements before requiring an additional EUO. *Id.* at 665. The contractual provisions at issue in *Morris* were nearly identical to those in this case: There was a Your Duties After Loss section and a provision stating that there could be no suit until those obligations were satisfied. *Id.* at 666. The Indiana Supreme Court made it clear that a Your Duties After Loss provision is *not* a cooperation clause that requires only reasonable assistance with the investigation of a claim, but is "an entirely separate condition that explicitly requires the policyholder to perform specific duties." *Id.* The insured must produce documents and sit for EUOs and cannot impose prerequisites on the performance of those duties. *Id.* "Compliance [is] not optional or subject to a trial court determination of reasonableness." *Id.* at 667. The reasonableness language in a Your Duties After Loss section—which requires EUOs and document production "as often as we [the insurer] reasonably require"— "describes how often the insurer can make requests, not the nature and extent of the information or statement sought. The policy contract does not itself impose an explicit general 'reasonableness' requirement on the insurer regarding *what* documentation the insurer

might demand of the insured or in *what* context the insurer might ask for an examination under oath." *Id.*

The court in *Morris* concluded that "[t]he Morrises breached the contract as a matter of law when they refused to provide an examination under oath until Economy [the insurer] fulfilled additional conditions prescribed by the Morrises." *Id.* at 666-67. In this case, similarly, the Fosters breached their insurance contract as a matter of law when they did not produce the documents necessary to complete Mrs. Foster's EUO. Under *Morris*, the Fosters were not permitted to demand that Mrs. Foster's EUO be completed before they substantially complied with State Farm's document requests. This conclusion is particularly secure here, given that the parties agreed that Mrs. Foster's EUO would be completed when certain documents were produced.

That was also our conclusion in *National Athletic*, 528 F.3d at 508, a remarkably similar insurance dispute under Indiana law. As in this case, in *National Athletic* the policyholder sued its insurer for breach of contract and bad faith, claiming that the insurer did not make a decision on the policy fast enough and, among other things, improperly insisted on continuing (or having a second) EUO with a particular person after he had already sat for an eight-hour EUO. *Id.* at 511. The insurance company in *National Athletic*, like State Farm in this case, claimed that it didn't have to pay because the insured failed to complete that EUO. *Id.* at 516. And, just as in this case, the insurer in *National Athletic* would

continue the critical EUO only once the insured produced requested documents. *Id.* at 514. Also like this case, the parties in *National Athletic* had a clear plan to continue the disputed EUO after the requested documents were produced. *Id.* at 515. The plaintiff in *National Athletic* failed to sit for the continuation of the EUO but also denied that it was *refusing* to sit for the EUO. *Id.* at 516. It was not a refusal, plaintiff protested, they had merely set "reasonable limitations," *id.*, or, as the Fosters put it, "a reasonableness boundary*." Morris* and the cases interpreting it, however, "make clear that the insureds cannot put conditions on their existing contractual duties. . . . More specifically in regard to this case, demanding that an EUO have 'reasonable limitations' lacks legal support." *Id.* at 518.

Because an insured cannot impose a reasonableness limit on "the nature and extent of the information or statement sought," *Morris*, 848 N.E.2d at 667, in *National Athletic* we discussed whether the plaintiff could get anywhere by objecting to the *number or frequency* of the insurer's requests for EUOs or documents or information:

> Plaintiff also couches its claim in the context of Defendant's many requests for documents and information. The implication is that after the Plaintiff provided thousands of pages of documents, spent many hours dealing with Defendant's document requests, and submitted to the first EUO, it was unreasonable to make Plaintiff submit to another EUO. While it is clear that the

> Plaintiff provided a great amount of cooperation with the Defendant's requests, one problem with this argument is that the Plaintiff left the first EUO with the understanding that the Defendant would request, and the Plaintiff would provide, more documents, and that another EUO would be held to discuss them.

528 F.3d at 522. And so it is here: Having unambiguously agreed to produce documents and complete Mrs. Foster's EUO, the Fosters have left themselves no room to argue that State Farm's requests were so numerous or frequent that they violated the insurance contract under *Morris.*

The Fosters emphasize that they produced for State Farm everything they possessed. We assume they did. But the Fosters misunderstand their duty under the contract as construed by *Morris*: Their duty was not (only) to give State Farm documents they happened to possess physically but to acquire and deliver requested documents related to their financial condition. *See Morris*, 848 N.E.2d at 666 (insured must comply with the "specific duties" imposed by a "Your Duties After Loss" provision); *Wood v. Allstate Ins. Co.*, 21 F.3d 741, 747 (7th Cir. 1994) (financial condition of the insured is relevant when a possibility is raised that the insured set fire to her own house). As a matter of law, the Fosters' failure to produce requested documents or even explain why they could not, and their related failure to complete Mrs. Foster's EUO, materially breached the contract. The closer we look, the clearer this is. The Fosters' failures to produce were basic:

*Tax Returns from 2002, 2003, and 2008*. State Farm requested the Fosters' tax returns for 2002-2008. As of the beginning of September 2009, the Fosters had produced their returns for 2004-2007 but not for 2002, 2003, and 2008. On September 21, State Farm restated its request for the missing returns. The Fosters responded ten days later that "Linda [Foster] is looking to find these tax returns. Otherwise, we will submit a request to the IRS . . . ." Two months later, on December 2, 2009, State Farm told the Fosters that it had not received the missing returns and that it was willing to reimburse the Fosters for fees they would incur if they had to get new copies from the IRS. Approximately one week later, without having produced their 2002, 2003, and 2008 tax returns, the Fosters declared that they had provided "necessary authorizations to obtain financial information. Please see all previous responses or information in your possession related to this claim. [The Fosters] possess nothing further to produce."

*Income from eBay*. During her August 26, 2009 EUO, Mrs. Foster informed State Farm that she had income from selling items on eBay. In September, State Farm requested documentation of that income. In October, the Fosters responded this way: "We are making a reasonable inquiry into this request and to the extent other items produced or yet to be produced do not evidence the sale of EBay [sic] items, we will continue to investigate." Two months later, State Farm wrote that it had not received the requested documents. On December 11, without having given State Farm responsive documents,

the Fosters stated that they "possess nothing further to produce."

*Mortgage Applications*. In September 2009, State Farm twice requested the Fosters' applications for the first and second mortgages on their home. In October, the Fosters said that they did not have copies of their mortgage applications. Two months later, State Farm informed the Fosters that they had received bank records about a line of credit that Mrs. Foster said was for the second mortgage. The records did not contain the mortgage application, however. State Farm said it would request the second mortgage application itself. As for the first mortgage, which was with a different bank, State Farm requested the application directly from the bank but was refused. State Farm communicated that refusal to the Fosters, indicating that they needed to get that application themselves. On December 11, the Fosters acknowledged that they had not produced the applications and said that if State Farm's own requests for mortgage applications had been refused, it should inform the Fosters of the protocol to request applications and they would execute the request. Otherwise, they "possess nothing further to produce."

*Bank Statements*. In September 2009, State Farm requested statements for twenty-one different accounts and lines of credit dating back to 2002. The Fosters responded in October with statements for three accounts and a message that, for most of the other accounts, they had sent requests to creditors for statements. In December, State Farm gave the Fosters an account-by-

account inventory: The Fosters had provided at least some records for four accounts, said that three of the accounts may relate to Mr. Foster's law practice, but had not produced statements (or an explanation for nonproduction) for the remaining accounts. The Fosters responded to State Farm's inventory with a general statement about all the accounts: They had made requests, produced to State Farm the statements that had been delivered to them, provided State Farm with authorizations, and now "possess nothing further to produce."

*Possible Suspect*. Finally, a non-financial example: In September 2009, State Farm requested "[t]he name of the police officer that according to Mrs. Foster, had a heart attack as a result of Mr. Foster [a lawyer] questioning him while on the stand. Mrs. Foster also mentioned him as a suspect to starting the fire during [her] September 10, 2009 examination under oath." The Fosters responded that they "do not remember the name of the officer that suffered a heart attack on the stand during Harry Foster III's cross-examination of him. The Fosters remember the police officer was and may still be a mall security guard." At the beginning of December, State Farm again asked for "information regarding the mall where the officer is a security guard." To that, the Fosters said they "are unaware of the mall where the officer may be a security guard."

In short: The Fosters did not provide State Farm with documents and information as requested. If we stop right there, this is an easy case under *Morris* and *National Athletic*. And the district court case the Fosters rely on

in their briefs, *Keten v. State Farm*, No. 2:06-cv-341, 2010 WL 1258198 (N.D. Ind. Mar. 29, 2010), where the insureds produced all requested documents not destroyed in a fire, and the district court case the Fosters cited at argument but *not* in their briefs, *New Berean Missionary Baptist Church, Inc. v. State Farm Fire & Cas. Ins. Co.*, No. 1:08-cv-1584, 2010 WL 2010464 (S.D. Ind. May 18, 2010), do not persuade us to reach a different conclusion.

But the Fosters also attempt to move their case out from under *Morris* and *National Athletic* by insisting that their hand was forced—their hunt for documents had to end and they had to sue when they did—because the one-year limitations period in their contract was about to expire. Their apparent noncompliance with the contract's express terms, especially the requirement that "[n]o action shall be brought unless there has been compliance with the policy provisions," was a function of the limitations period. How could they have been required to wait to sue and risk facing a winning limitations-period defense from State Farm? The short answer is that they faced no such risk, regardless of what the contract said.

In 2007, Indiana passed a law requiring that insurance policies covering "first party loss to property located in Indiana" that "insures against loss or damage to . . . real property . . . which is the principal place of residence of the named insured . . . may not be issued, **renewed**, or delivered to any person in Indiana if the policy limits a policyholder's right to bring an action against an insurer to a period of less than two (2) years from the date of loss." Ind. Code § 27-1-13-17 (emphasis added).

The Fosters renewed the policy on their Indiana home, their principal place of residence, in 2008. They are obviously covered by the statute. And State Farm said as much. When the Fosters told State Farm they were concerned about the contractual limitations period, State Farm wrote:

> I would point out that your statement that suit must be initiated by January 3, 2010 is not accurate since the implementation of Ind. Code § 27-1-13-17 on June 27, 2007 establishing the minimum period of a policyholder to bring an action against an insurer to no less than two years from the date of loss. Notwithstanding the enactment of this legislation, it is still State Farm's intent to complete its investigation into the Fosters' claim as quickly and efficiently as possible. To that end, I would urge you and your clients to provide the outstanding documents as quickly as possible.

But the Fosters were unsure if this actually guaranteed them at least two years to sue because of the letter's next paragraph:

> Finally, State Farm Fire and Casualty Company has asked me to remind you and your clients that they are continuing to investigate this claim under a full reservation of rights and that no action by the Company should be construed as a waiver of any of your clients' rights, duties or obligations under the policy, nor as a waiver of any of State Farm's rights or defenses, all of which are specifically reserved.

Similar boilerplate concluded every letter from State Farm. But, giving the Fosters the benefit of the doubt, let's assume that the letter was not a clear statement that they had at least two years to sue.

The express terms of their policy with State Farm should have allayed any lingering doubts:

> **Conformity to State Law.** When a policy provision is in conflict with the applicable law of the State in which this policy is issued, the law of the State will apply.

And if this didn't give the Fosters certainty, they could have consulted Indiana common law, which provides for the same result: "The terms and conditions of the contract include the relevant statutory provisions which exist at the time the contract is made as if such provisions were expressly incorporated." *Wencke v. Indianapolis*, 429 N.E.2d 295, 297 (Ind. Ct. App. 1981). But the Fosters complain that, on top of all this, State Farm did not offer a tolling agreement. And it is true, State Farm did not. But that would only be relevant if the Fosters had asked for one. They did not. The limitations period was two years and it was the Fosters' responsibility to understand that.

In addition to their contract claim, the Fosters appeal the district court's grant of summary judgment on their bad faith claim. Under Indiana law, if State Farm wrongfully slow-walked the Fosters' request for coverage, even if they had not yet denied payment on the policy, State Farm could be liable for the tort of insurance bad faith. *See Erie Ins. Co. v. Hickman*, 622 N.E.2d

515, 519 (Ind. 1993); *but cf. Kartman v. State Farm*, 634 F.3d 883, 891 (7th Cir. 2011). That said, on this record, State Farm is entitled to judgment as a matter of law. To prove bad faith, there must be an element of "dishonest purpose, moral obliquity, furtive design, or ill will." *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005). There is no record evidence of that. To the contrary, the record reveals nothing more than State Farm's attempt to investigate a substantial claim made after an intentionally set fire. "[A] good faith dispute concerning insurance coverage cannot provide the basis for a claim in tort that the insurer breached its duty to deal in good faith with its insured. . . . And '[t]his is so even if it is ultimately determined that the insurer breached its contract. That insurance companies may, in good faith, dispute claims has long been the rule in Indiana.'" *Id.* at 976 (quoting *Hickman*, 622 N.E.2d at 520). The Fosters argue that *Hamed & Michigan Foods, Inc. v. General Accident Ins. Co.*, 842 F.2d 170 (7th Cir. 1988) requires a different conclusion. It certainly does not: In *Michigan Foods* (as the parties call it) the insurer dragged its feet for months after the insured had satisfied the insurer's requests for documents and EUOs. *Id.* at 171. That could be bad faith but, as we have explained, nothing similar happened to the Fosters.

The district court properly granted State Farm's motion for summary judgment on both issues. Our conclusion should not be overread, however: We do not understand *Morris* to license badgering and irrelevant demands for documents and information or endless EUOs. But, notwithstanding the Fosters' representations, that is not this case; *Morris* does require policyholders to perform

their specific "duties after loss." And that the Fosters did not do.

AFFIRMED.